IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-344

Filed 5 August 2026

Macon County, No. 23CR000360-550

STATE OF NORTH CAROLINA

v.

RONALD SCOTT LINDSAY

Appeal by Defendant from Judgment entered 13 May 2024 by Judge Steve R. Warren in Macon County Superior Court.  Heard in the Court of Appeals 28 January 2026.

*Attorney General Jeff Jackson, by Special Deputy Attorney General Heidi M. Williams and Special Deputy Attorney General Benjamin O. Zellinger, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Amanda S. Zimmer, for Defendant-Appellant.*

HAMPSON, Judge.

## Factual and Procedural Background

Ronald Scott Lindsay (Defendant) appeals from a consolidated Judgment entered pursuant to jury verdicts finding him guilty of twelve counts of Felony Obstruction of Justice and two counts of Misdemeanor Obstruction of Justice. The Record before us, including evidence presented at trial, tends to reflect the following:

On 31 May 2022, Defendant was indicted by a Cherokee County grand jury on

twenty counts of Felony Obstruction of Justice.[1] The indictments arose from alleged conduct by Defendant during his employment as the Attorney for the Cherokee County Department of Social Services (Cherokee DSS).

The Indictments[2] stated:

> THE JURORS FOR THE STATE, UPON THEIR OATH, present that on or about [Date], in Cherokee County, the defendant named above unlawfully, willfully and feloniously did obstruct justice. The defendant, as the attorney for the Cherokee County Department of Social Services, created, improperly prepared, approved, made a custom practice, and used a "Custody and Visitation Agreement" (CVA) in the matter of [Minor Child], which was an agreement that allowed the removal of minor children from their parent(s) without court involvement, in violation of North Carolina law. The use of this agreement effectively avoided judicial oversight into the activities of Cherokee County DSS, and subverted the statutory process for determining abuse and neglect of children, and determining custody and parental rights. The practice of using a CVA in this matter interfered with the parental relationship between a parent and child, violating the constitutional and statutory rights of parents and minor children. This offense was done in secrecy and with malice; with deceit and intent to defraud; was infamous; and was done in violation of the common law, and against the peace and dignity of the State.

Before trial, Defendant moved to dismiss the Indictments for failing to state a crime. The trial court denied the Motion.

A jury trial began on 29 April 2024. The State introduced copies of the Custody and Visitation Agreements (CVAs) underlying the charges. CVAs had captions atop

---

[1] Venue was transferred from Cherokee County to Macon County in October 2023.

[2] Each Indictment specified the date of each alleged offense and the name of the Minor Child at issue. Otherwise, the language of all twenty Indictments was identical.

their first pages, featuring the text "NORTH CAROLINA"; "CHEROKEE COUNTY"; and "CUSTODY AND VISITATION AGREEMENT[.]"[3] Initial paragraphs typically indicated the CVA was "made and entered into . . . by and between" the Parent(s) of a Minor Child and another person (Caretaker) who would take "custody" of the Minor Child pursuant to the agreement. Under "WITNESSETH[,]" the names of the Parent(s), Minor Child(ren), and Caretaker(s) were listed.

Next, a typical CVA included provisions like the following:

> Whereas, [Caretakers], are able to provide a loving and stable home environment for said child and can provide for the support and maintenance of said child if the said child resides with them in their home;

> Whereas, the parties hereto desire to enter into this Agreement setting forth the terms and conditions for the care, custody and control of [Minor Child] which the parties hereto deem to be in the best interest of said child in order to adequately provide a loving and stable future for said child now and in the future.

> NOW, THEREFORE, [Parents] and [Caretakers], do hereby stipulate and agree as follows:

> 1. The legal and physical care, custody and control of [Minor Child] . . . shall be placed with . . . [Caretakers], until such time as [Minor Child] shall become 18 years of age or is otherwise emancipated. [Caretakers] shall hereafter be the caretakers of the child as that term is defined by G.S. 7B-101(3); and

> 2. [Parents] shall have the right to have visitation with the [Minor Child] at reasonable times and for a reasonable length of time on

---

[3] The CVAs' captions varied slightly. Most CVAs used the language "CUSTODY AND VISITATION AGREEMENT[.]" One CVA was captioned "CUSTODY, GUARDIANSHIP AND VISITATION AGREEMENT[.]" Three were captioned "CHILD CUSTODY AND VISITATION AGREEMENT[.]"

each visitation period as [Caretakers] may agree from time to time in the future subject to [various] terms and conditions . . . .

. . . .

6. It is stipulated and agreed that [Caretakers] shall have full power and authority to seek, obtain and consent to and for any medical or health care, emergency or otherwise, which may be necessary or advisable in providing for the best interests and care of [Minor Child]. It is further stipulated and agreed that [Caretakers] shall have full power and authority to enroll the child in school . . . [and] to consent to any and all extracurricular activities, sports activities and programs which are necessary or beneficial to provide for the complete and well-rounded education of the child.

7. It is stipulated and agreed that [Caretakers] may enroll and carry the child on their health care insurance or any other insurance for which the child may qualify as a member of the [Caretakers'] home and household. It is further stipulated and agreed that for the purposes of filing State and/or Federal income tax returns that [Caretakers] may claim the child as a dependent and as an exemption and, [Caretakers] shall be entitled to any claim and take advantage of any other tax benefit available to them because the child is a member of the [Caretakers'] home and household.

8. It is hereto stipulated and agreed that the home state of the child as defined by the Uniform Child Custody Jurisdiction Act is North Carolina and any and all legal proceedings involving the custody of or visitation with the child shall and must be filed, litigated and decided in the Courts of the State of North Carolina pursuant to applicable North Carolina law and North Carolina judicial decisions.

9. It is hereto stipulated and agreed that the site of this Agreement is North Carolina and said Agreement shall be interpreted in accordance with and governed by the laws and judicial decisions of the State of North Carolina.

IN WITNESS WHEREOF, the parties hereto have set their hands

and seals, the day and year first above written.

CVAs were signed by Parent(s) and Caretaker(s) and notarized by a Notary Public. CVAs were signed at various locations, including Parents' homes and the Cherokee DSS office. Neither Defendant nor any other Cherokee DSS employee signed the CVAs. Testimony indicated no Parent had an attorney present when signing a CVA. Multiple Parents testified Cherokee DSS did not inform them they would have the right to an attorney if a case involving their children or parental rights instead went to court.

Lisa Cauley, the Division Director of Social Services at the North Carolina Department of Health and Human Services (DHHS), testified for the State as an expert witness "in the field of social work[,] abuse, neglect, and dependency processes[.]" Cauley participated in an investigation of Cherokee DSS after DHHS was "alerted to concerns" about the agency's use of CVAs.[4]

Cauley testified a social services agency like Cherokee DSS "does not have the authority to remove a child from parents; a judge has to make that decision." Rather, DSS staff must follow the procedures set out in Chapter 7B of the North Carolina General Statutes. Under Chapter 7B, the District Court has exclusive jurisdiction to: adjudicate juveniles abused, neglected, or dependent; authorize DSS to take

---

[4] As a result of this investigation, DHHS "took over the operation" of Cherokee DSS in 2018. Cauley testified DHHS took this step for the purpose of "bring[ing] the county back into compliance with law, rule, and policy."

nonsecure custody of juveniles and place them in other homes; and terminate parental rights.

The State inquired further on this topic:

> [The State]: So the decision about whether to dislodge [a] child from their parents, who makes that decision?
>
> [Cauley]: . . . there are times where parents would voluntarily temporarily make that decision in a safety plan. But if you were looking at parents losing custody of children, . . . that decision would be made by a judge.
>
> [The State]: Okay. And so a parent giving up their child until they're emancipated or 18 years old, that decision would have to come from a judge; is that correct?
>
> [Cauley]: An agency couldn't make that decision without a judge, that's correct.

Cauley also testified about parents' statutory right to counsel during these proceedings, specifically noting attorneys are provided to indigent parents at no cost. Further, Cauley explained a parent entitled to an appointed attorney by statute may waive this right only if the judge determines the waiver is knowing and voluntary.

In her testimony, Cauley also confirmed: CVAs "were done without any petition" by Cherokee DSS to the District Court; "the usage of [CVAs] . . . is [not] found anywhere" in the North Carolina General Statutes; and DHHS has "no policy that allows" social services agencies to use CVAs.

Several Social Workers who worked with Defendant at Cherokee DSS testified. Social Work Supervisor David Hughes (SWS Hughes) started at the agency in 2011;

in 2016, he was promoted to Supervisor of the Child Protective Services Unit (CPS Unit), which handled reports of child abuse, neglect, and dependency. The CPS Unit had a large caseload; in one year, it received "probably 400 reports[,]" or "more than one report a day." SWS Hughes explained the CPS Unit was usually short-staffed during his tenure; the unit was "supposed to have . . . seven social workers[,]" but "at one point . . . [it] only had two[.]"

SWS Hughes testified DHHS performed an audit of the CPS Unit in October 2016. The audit recommended the CPS Unit "needed to close out cases, get our numbers down. We also needed to hire more social workers. But the big thing was getting the numbers down." SWS Hughes confirmed that after the DHHS audit, Cherokee DSS' "usage of [CVAs] increase[d] to close cases faster."

According to SWS Hughes, the idea to use CVAs "came from" Defendant, who "had produced an original [CVA] template." Defendant sometimes drafted CVAs himself. At other times, Social Workers, using Defendant's template, "basically change[d] some wording," adding information like names, addresses, dates of birth, and relevant circumstances, so each CVA would be "tailor-made to that particular case." According to SWS Hughes, Defendant would ask Social Workers to send him their draft CVAs "so he could look them over before they were presented to the parents." Defendant would typically reply to Social Workers with revised CVAs or indicate their drafts were "good to go." In an email exchange introduced into evidence by the State, SWS Hughes sent Defendant a draft CVA and requested he "check this

out and see if it meets your approval[.]" Defendant emailed back a revised CVA, and added, "If you have any questions or concerns after you review the attached custody agreement, please let me know."

SWS Hughes confirmed Defendant, in his position as Cherokee DSS Attorney, was responsible for arguing the agency's petitions for an adjudication of abuse, neglect, or dependency in District Court. SWS Hughes recounted a meeting with Defendant on a day Defendant lost multiple petition cases in court. A "frustrated" Defendant told SWS Hughes, "it's expensive to file these petitions." SWS Hughes acknowledged it was "cheaper to do a [CVA] than it is to do a petition[.]" This was because the state or county usually had to spend "a lot of money" to provide services to families after a petition case reached a disposition in District Court.[5] It also "took a lot longer to do a petition and go to the court" compared to doing a CVA.

SWS Hughes testified about the types of cases for which CVAs tended to be proposed by Cherokee DSS staff. At weekly staff meetings, "most" of which Defendant attended, Social Workers would discuss their "stuck cases[.]"

The State asked SWS Hughes to define a "stuck case":

> [SWS Hughes]: Well, say, the family is refusing to follow through with the services that have been recommended. . . . They're telling the social worker, 'I'm not coming to the door anymore, don't bother coming to my house.' They won't go for assessments at a mental health provider, or they won't go to a mental health provider that has classes set up for them. They are just basically

---

[5] As multiple witnesses testified, after a CVA was executed in a case, Cherokee DSS closed the case and did not follow up with or provide any further services to Parents or Minor Children.

refusing to participate in the services. And they are telling [Cherokee DSS] . . . 'I'm through with you all. My child, perhaps, is already living with my parents, the grandparents. Just tell me what I need to do, I'm ready to sign my child over.' That was the reply a lot of times that we would get.

[The State]: Okay. What if [a parent] didn't say 'I want to turn my child over,' but they just said, 'I'm done with you, stop coming to my door,' . . . why would the case be stuck?

[SWS Hughes]: Well . . . it's basically just refusing to cooperate with DSS. And if . . . we had a conversation or the social worker did with the family when they said, 'I'm ready to sign my child over,' when [a Social Worker] brought that information back and discussed it in the staff meeting, then a CVA might be brought up as the alternative to the situation. Because a lot of times these parents would say, . . . 'I'll do whatever I've got to do, I don't want to go to court. I just want to sign my children over to my parents and get you all out of my life.'

[The State]: Sir, isn't the reason these cases were stuck is because the parent didn't want to cooperate but [Cherokee] DSS didn't want to go to court?

[SWS Hughes]: It could be a little bit of both.

[The State]: . . . in that situation, wouldn't the case be stuck because [Cherokee DSS] felt like [it] w[as] going to lose at court, but at the same time the parent wasn't responding how [Cherokee DSS] wanted them to?

[SWS Hughes]: That's correct. There might not have been enough evidence that [Cherokee DSS] would win a case if [it] did file petitions.

Per SWS Hughes, Cherokee DSS staff "would confer with [Defendant]" as to whether there was sufficient evidence to successfully bring a petition in court and Defendant "would weigh in" on the decision to file a petition or use a CVA.

Former CPS Unit Social Worker Katie Brown (SW Brown) testified Defendant "introduced" CVAs to her. SW Brown first received a "blank [CVA] template" from Defendant by email. She "ha[d] to" send Defendant her draft CVAs so he could "make sure that everything was written in there correctly."

Former Social Worker Laurel Smith (SW Smith) testified. When she worked for Cherokee DSS, SW Smith originally thought a CVA was "equivalent to a legal document that would be the same as if we went to court[.]" SW Smith testified she had this understanding "because we were told that [a CVA] was a legal document" by Defendant.

In an email introduced by the State, SW Smith asked Defendant, "[w]ould it be possible to draw up a custody order" for a particular case. In his reply email, Defendant wrote:

> Attached is the draft of . . . [the] custody/guardianship/visitation agreement for your file. Please let me know if anything needs to be corrected, changed, or added. Hopefully this agreement will suffice provided no one challenges it in court.

Former CPS Unit Social Worker Courtney Myers (SW Myers) recalled raising "concerns" to her colleagues about whether CVAs "were proper or not." SW Myers "voice[d]" these concerns "to make sure that [CVAs] . . . w[ere] something we could do, because any other time we needed a judge's decision on changing custody of a child." SW Myers's supervisor asked Defendant to join a meeting to answer her questions, and "[Defendant] said that we could do [CVAs], it was fine."

According to SW Myers, CVAs became "an internal practice" at Cherokee DSS based on Defendant's legal advice. She could not "do . . [a] [CVA]" without Defendant's review and approval.

SW Myers further testified Defendant advised her certain cases would be "weak petitions," meaning it was unclear whether Cherokee DSS had enough evidence to file the petition and "win" in court. SW Myers recounted wanting to file a petition in a particular case, noting her social work training had taught her a petition "would have been the next step" because the Parents "weren't working their case plan[,]" as they "hadn't done enough to address the safety concerns that got [Cherokee] DSS involve[d]." However, Cherokee DSS elected to use a CVA because it was decided the case "would have been a weak petition."

The State called District Court Judge Monica Leslie as a witness. Judge Leslie presided over abuse, neglect, and dependency cases in Cherokee County.

Judge Leslie described a December 2017 meeting Defendant attended at the county courthouse. A Parent had hired an attorney to challenge the CVA the Parent had signed.

Judge Leslie recounted questions she asked Defendant about CVAs:

> [Judge Leslie]: I asked what statutory or legal authority he had to . . . enter these agreements . . . to prepare or write the CVAs. . . . And [Defendant's] response was 'None.'

At the close of its evidence, the State dismissed six of the twenty Indictments. Defendant made Motions to Dismiss the remaining charges for insufficient evidence

at the close of the State's evidence and the close of all evidence.[6] The trial court denied both Motions.

At the charge conference, the parties discussed a proposed jury instruction on a theory of aiding and abetting. Defendant objected to the instruction. The trial court overruled Defendant's objection and instructed the jury on the theory of aiding and abetting Obstruction of Justice using the North Carolina Pattern Jury Instruction.[7]

The jury found Defendant guilty on all fourteen counts of Obstruction of Justice. In its Judgment, the trial court consolidated the counts and sentenced Defendant to five to fifteen months in prison, suspended for twelve months of unsupervised probation. Defendant provided oral Notice of Appeal after the jury announced its verdict but before the trial court pronounced his sentence.

## **Appellate Jurisdiction**

"Notice of appeal shall be given within the time, in the manner and with the effect provided in the rules of appellate procedure." N.C. Gen. Stat. § 15A-1448(b) (2025). Rule 4(a) of the North Carolina Rules of Appellate Procedure provides "appeal from a *judgment* or order of a superior or district court" may be taken by "giving oral notice of appeal at trial[.]" (emphasis added). "An oral notice of appeal given before entry of the final judgment violates Rule 4 and does not give this Court jurisdiction to hear the defendant's direct appeal." *State v. Jones*, 296 N.C. App. 512, 515, 909

---

[6] Defendant declined to present evidence.

[7] *See* N.C.P.I.--Crim. 202.20 (titled "Aiding and Abetting--Felony, Misdemeanor").

S.E.2d 373, 376 (2024) (citing *State v. Smith*, 292 N.C. App. 662, 665, 898 S.E.2d 909, 912 (2024) and *State v. Lopez*, 264 N.C. App. 496, 503, 826 S.E.2d 498, 503 (2019)).

In the instant case, the Record reflects that after the jury announced its verdict but prior to sentencing, defense counsel said, "I better say we appeal this verdict." Thus, as Defendant prematurely entered oral Notice of Appeal before entry of the final Judgment in violation of Rule 4 of our Rules of Appellate Procedure, this Court does not have jurisdiction to hear Defendant's appeal. *See Jones*, 296 N.C. App. at 515, 909 S.E.2d at 376.

Defendant, acknowledging this defect, filed a Petition for Writ of Certiorari to allow us to hear this appeal. "The writ of certiorari may be issued in appropriate circumstances by either appellate court to permit review of the judgments and orders of trial tribunals when the right to prosecute an appeal has been lost by failure to take timely action[.]" N.C. R. App. P. 21(a)(1) (2026). Here, it is clear Defendant expressed an intent to appeal although he failed to do so at the proper time. Thus, in our discretion, we allow Defendant's Petition and reach the merits of his appeal.

## Issues

The issues on appeal are whether: (I) the trial court erred by denying Defendant's Motions to Dismiss; (II) the trial court erred by instructing the jury on the theory of aiding and abetting; and (III) the Indictments were sufficient.

## Analysis

I.      Denials of Motions to Dismiss

Defendant contends the trial court erred by denying his Motions to Dismiss the Obstruction of Justice charges for insufficient evidence.

In ruling on a motion to dismiss, the trial court's task is to decide "whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of [the] defendant's being the perpetrator of such offense. If so, the motion is properly denied." *State v. Fritsch*, 351 N.C. 373, 378, 526 S.E.2d 451, 455 (2000) (citation and quotation marks omitted). "The evidence is 'substantial' if it is relevant and adequate to convince a reasonable mind to accept a conclusion." *State v. Ford*, 388 N.C. 713, 720, 923 S.E.2d 549, 554 (2025) (citation and quotation marks omitted). However, "[i]f the evidence is sufficient only to raise a suspicion or conjecture" that the defendant committed the offense, the trial court must grant the motion to dismiss. *Fritsch*, 351 N.C. at 378, 526 S.E.2d at 455 (citation and quotation marks omitted).

"In deciding whether the evidence presented is substantial, the trial court must view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences[.]" *Ford*, 388 N.C. at 720, 923 S.E.2d at 554 (citations and quotation marks omitted). "Any contradictions or conflicts in the evidence must be resolved in the State's favor." *Id.* (citation omitted). "It is immaterial whether the substantial evidence is circumstantial or direct, or both." *State v. Stephens*, 244 N.C. 380, 383, 93 S.E.2d 431, 433 (1956). "When ruling on a motion to dismiss, the trial court should be concerned only about whether the evidence is sufficient for jury

consideration, not about the weight of the evidence." *Fritsch*, 351 N.C. at 379, 526 S.E.2d at 455-56 (citation omitted). "Whether the State presented substantial evidence of each essential element of the offense is a question of law; therefore, we review the denial of a motion to dismiss de novo." *State v. Crockett*, 368 N.C. 717, 720, 782 S.E.2d 878, 881 (2016) (citation omitted).

The elements of felony Obstruction of Justice are: "(1) the defendant unlawfully and willfully; (2) obstructed justice; (3) with deceit and intent to defraud." *State v. Ditenhafer*, 373 N.C. 116, 128, 834 S.E.2d 392, 400 (2019) (quoting *State v. Cousin*, 233 N.C. App. 523, 537, 757 S.E.2d 332, 342-43 (2014)). Here, Defendant argues "[t]he State did not present sufficient evidence that [he] . . . willfully obstructed justice by using CVAs for the purpose of hindering or impeding a proceeding or investigation." Thus, Defendant challenges two essential elements of Obstruction of Justice. First, he claims the State did not show his acts obstructed justice within the meaning of the offense. Second, Defendant contends there was insufficient evidence he acted willfully.

A. *Obstructive Acts*

Obstruction of Justice "may take a variety of forms." *In re Kivett*, 309 N.C. 635, 670, 309 S.E.2d 442, 462 (1983) (citation and quotation marks omitted). The offense incorporates "any act which prevents, obstructs, impedes, or hinders public or legal justice." *Ford*, 388 N.C. at 720-21, 923 S.E.2d at 555 (citation and quotation marks omitted).

In *State v. Coffey*, this Court clarified the categories of "acts" that satisfy the conduct element of this offense. 292 N.C. App. 463, 898 S.E.2d 359, *disc. review denied*, 386 N.C. 341, 901 S.E.2d 796 (2024). There, we held:

> [F]or an act to meet the elements of obstruction of justice—that is, an 'act which prevents, obstructs, impedes or hinders public or legal justice'—the act—even one done intentionally, knowingly, or fraudulently—must nevertheless be one that is done for the purpose of hindering or impeding a judicial or official proceeding or investigation or potential investigation, which might lead to a judicial or official proceeding.

*Id.* at 471, 898 S.E.2d at 364 (citation omitted). *See also State v. Wilkins*, 295 N.C. App. 695, 700, 907 S.E.2d 74, 78 (2024) (citing this definition from *Coffey* and describing it as the definition of "[a]n obstructive act"). A judicial or official proceeding or investigation need not be pending for the acts to obstruct justice. *See Coffey*, 292 N.C. App. at 471, 898 S.E.2d at 364; *State v. Wright,* 206 N.C. App. 239, 243, 696 S.E.2d 832, 836 (2010) (where defendant, an elected official, filed false campaign finance reports prior to any proceeding related to this misconduct began, "the lack of any pending proceeding" was "immaterial" to the validity of the obstruction of justice charge against him). Obstruction of Justice may be based on acts alleged to obstruct current or potential proceedings or investigations in criminal or civil contexts. *See Coffey*, 292 N.C. App. at 469-70, 898 S.E.2d at 363-64 (summarizing cases arising from criminal and civil investigations and proceedings).

Here, evidence at trial showed Defendant "introduced" CVAs to Cherokee DSS. The CVA idea "came from [Defendant]." Defendant "produced an original [CVA]

template[.]" Defendant drafted CVAs himself. CVAs drafted by Social Workers required his review and approval. As a result, the use of CVAs became an "internal practice" Cherokee DSS employed to "get cases closed faster[,]" resolve "stuck cases[,]" and as an alternative to filing "weak petitions[.]"

However, as Cauley explained, CVAs are "[not] found anywhere" in our General Statutes, which instead grant the District Court exclusive jurisdiction to adjudicate juveniles abused, neglected, or dependent, authorize DSS to remove juveniles from a parent's custody, and terminate parental rights. DSS itself "does not have the authority to remove a child from a parent; a judge has to make that decision." Thus, the jury heard evidence indicating Defendant used CVAs to avoid judicial proceedings protecting the rights of parents and juveniles.

Thus, viewed in the light most favorable to the State, there was substantial evidence Defendant acted for the purpose of hindering, impeding, or obstructing a potential judicial proceeding by enabling Cherokee DSS, through the use of CVAs, to circumvent statutory procedures, statutory protections, and court oversight over cases.[8] *See Coffey*, 292 N.C. App. at 471, 898 S.E.2d at 364.

B. *Willfulness*

"Ordinarily, 'wil[l]ful' as used in criminal statutes, means the wrongful doing

---

[8] It is immaterial that Cherokee DSS did not file petitions in District Court before facilitating the execution of CVAs because a pending proceeding is not required for Obstruction of Justice. *See Coffey,* 292 N.C. App. at 471, 898 S.E.2d at 364; *Wright,* 206 N.C. App. at 243, 696 S.E.2d at 836.

of an act without justification or excuse, or the commission of an act purposely and deliberately in violation of law." *State v. Williams*, 284 N.C. 67, 72, 199 S.E.2d 409, 412 (1973) (brackets and quotation marks omitted) (citing *State v. Arnold*, 264 N.C. 348, 141 S.E.2d 473 (1965)); *accord State v. Ramos*, 363 N.C. 352, 355, 678 S.E.2d 224, 226 (2009).

Defendant argues "[t]here was no evidence that [he] acted without justification or excuse, or committed an act purposely and deliberately in violation of law." In response, the State argues the evidence "showed that Defendant acted willfully because he knew CVAs were not based on any lawful authority" but he nonetheless "encouraged their use[.]" We agree with the State.

The State introduced Defendant's email to SW Smith in which he stated, "[h]opefully this [CVA] will suffice provided no one challenges it in court." Judge Leslie testified Defendant said "None" when she asked him for a "statutory or legal authority [he] had to . . . prepare or write the CVAs." The email tends to show Defendant knew CVAs were unlawful instruments because they would only "suffice" if not challenged in court. Judge Leslie's testimony showed Defendant used CVAs despite knowing no statutory or legal authority supported the practice. This is substantial evidence Defendant committed wrongful acts without lawful justification or excuse and/or acted purposely and deliberately in violation of law. *See Williams*, 284 N.C. at 72, 199 S.E.2d at 412.

Thus, the State presented substantial evidence Defendant committed

"obstructive acts," *see Coffey*, 292 N.C. App. at 471, 898 S.E.2d at 364-65, and did so willfully, *see Williams*, 284 N.C. at 72, 199 S.E.2d at 412. Thus, there was substantial evidence of the two essential elements of the offense Defendant challenges on appeal. *See Fritsch*, 351 N.C. at 378, 526 S.E.2d at 455. Therefore, the trial court did not err by denying Defendant's Motions to Dismiss the Obstruction of Justice charges for insufficient evidence. *See id.*

II.     Aiding and Abetting Jury Instruction

Defendant argues the trial court erred by instructing the jury on the theory of aiding and abetting. Where, as here, "the defendant preserves his challenge to jury instructions by objecting at trial, we review the trial court's decisions regarding jury instructions *de novo*." *State v. Hope*, 223 N.C. App. 468, 471-72, 737 S.E.2d 108, 111 (2012) (citation, quotation marks, brackets, and ellipsis omitted).

> Under North Carolina law, a jury instruction on aiding and abetting is supported by sufficient evidence if there is evidence that '(i) the crime was committed by some other person; (ii) the defendant knowingly advised, instigated, encouraged, procured, or aided the other person to commit that crime; and (iii) the defendant's actions or statements caused or contributed to the commission of the crime by that other person.'

*State v. Young*, 196 N.C. App. 691, 695-96, 675 S.E.2d 704, 707 (2009) (quoting *State v. Goode*, 350 N.C. 247, 260, 512 S.E.2d 414, 422 (1999)). The State is not required to prove any element of aiding and abetting "beyond a reasonable doubt before the trial court may instruct on aiding and abetting; there needs only to be evidence supporting the instructions, and the jury is to determine whether the State has proved the

elements beyond a reasonable doubt." *State v. Baskin*, 190 N.C. App. 102, 111-12, 660 S.E.2d 566, 573-74 (2008) (citation omitted).

Here, as we have discussed, the evidence was sufficient as a matter of law to overcome Defendant's Motions to Dismiss and submit the Obstruction of Justice charges to the jury. Thus, regarding the first element of aiding and abetting, because there was evidence other Cherokee DSS employees participated in and facilitated the agency's use of CVAs, the evidence supported instructing the jury the offense was also "committed by some other person[s][.]" *See Young*, 196 N.C. App. at 696, 675 S.E.2d at 707.

The evidence also indicated Defendant knowingly advised, encouraged, and aided his colleagues to obstruct justice through the use of CVAs. *See id*. Social Workers testified Defendant originated the CVA idea, introduced CVAs to the agency, and produced an original CVA template. Social Workers testified their draft CVAs required Defendant's review and approval. According to SWS Hughes, Cherokee DSS staff "would confer with" Defendant on whether the agency had enough evidence to bring successful petitions in court, and he would "weigh in" on decisions to file petitions or use CVAs. Further, emails introduced by the State showed Defendant drafted, reviewed, revised, and approved CVAs.

Regarding the final element of aiding and abetting, evidence indicated Defendant caused or contributed to the commission of Obstruction of Justice by his colleagues. *See id.* Again, Social Workers testified Defendant was required to review

and approve CVAs before they were presented to parents. SW Myers recounted raising concerns about Cherokee DSS using CVAs to "chang[e] custody of a child" without "a judge's decision[.]" However, SW Myers testified Defendant told her it was "fine" and the agency "could do [CVAs]." Per SW Myers, CVAs became an "internal practice" at the agency based on Defendant's legal advice. Moreover, SW Smith testified Defendant "told" Cherokee DSS staff that a CVA "was a legal document[.]" This evidence showed Defendant contributed to the commission of Obstruction of Justice by his colleagues by: introducing CVAs to the agency; drafting CVAs; reviewing and approving drafts created by Social Workers; and sanctioning the use of CVAs through his authority as the Cherokee DSS Attorney.

Therefore, because there was sufficient evidence of all elements of aiding and abetting, *see id.* at 695-96, 675 S.E.2d at 707, and the evidence supported giving the instruction, *see Baskin*, 190 N.C. App. at 111-12, 660 S.E.2d at 573-74, the trial court did not err by instructing the jury on the theory of aiding and abetting.

III.    Sufficiency of Indictments

An indictment must include a "plain and concise factual statement in each count, which, without allegations of an evidentiary nature, asserts facts supporting every element of a criminal offense and the defendant's commission thereof with sufficient precision clearly to apprise the defendant . . . of the conduct which is the subject of the accusation." N.C. Gen. Stat. § 15A-924(a)(5). "[T]he test used to determine the validity of an indictment is simply, 'whether the indictment alleges

facts supporting the essential elements of the offense to be charged.' " *State v. Horton*, 294 N.C. App. 614, 617, 903 S.E.2d 870, 874 (2024) (quoting *State v. Stewart*, 386 N.C. 237, 241, 900 S.E.2d 652, 656 (2024)). "The sufficiency of an indictment is a question of law reviewed de novo." *State v. White*, 372 N.C. 248, 250, 827 S.E.2d 80, 82 (2019) (citation omitted).

There are "two distinct species of indictment [defects], jurisdictional and non-jurisdictional[.]" *State v. Singleton*, 386 N.C. 183, 196, 900 S.E.2d 802, 812 (2024). A jurisdictional defect "only aris[es] where an indictment wholly fails to allege a crime[.]" *Id.* at 184, 900 S.E.2d at 805. "[W]here a criminal indictment suffers from a jurisdictional defect, courts lack the ability to act." *Id.* On the other hand, the "failure to allege with sufficient precision [the] facts and elements of a crime" in an indictment is a non-jurisdictional defect. *Id.* at 199, 900 S.E.2d at 814. "A defendant seeking relief" from a non-jurisdictional defect "must demonstrate not only that such an error occurred, but also that such error was prejudicial." *Id.* at 210, 900 S.E.2d at 821 (citation omitted).

When an indictment for Obstruction of Justice "fails to allege that the acts were intended to interfere with an investigation or proceeding, it fails to allege facts supporting an element of the offense." *Wilkins*, 295 N.C. App. at 701, 907 S.E.2d at 79 (citing *Coffey*, 292 N.C. App. at 471, 898 S.E.2d at 365). Citing *Wilkins*, Defendant contends the Indictments "failed to allege conduct showing that [he] intended to interfere with an investigation," and thus "did not allege conduct that could be

understood to constitute" the offense. Thus, Defendant argues the Indictments suffer from a jurisdictional defect because they failed to state a crime. Therefore, Defendant argues the trial court erred by denying his Motion to Dismiss the Indictments.

*Wilkins* and *Coffey* involved "nearly identical" indictments for Obstruction of Justice. *Id.* As those cases established, for this offense, "[a]n obstructive act is 'one that is done for the purpose of hindering or impeding a judicial or official proceeding or investigation or potential investigation, which might lead to a judicial or official proceeding.' " *Id.* at 700, 907 S.E.2d at 78 (quoting *Coffey*, 292 N.C. App. at 471, 898 S.E.2d at 364). In *Wilkins*, we observed the indictment did not assert any facts indicating the defendant's wrongful acts in submitting falsified training records "were done to subvert a potential subsequent investigation or legal proceeding[.]" *Id.* at 701, 907 S.E.2d at 79 (citation and quotation marks omitted). Thus, we held the indictment did "not allege conduct that could be understood to constitute common law obstruction of justice and therefore fails entirely to allege a criminal act, creating a jurisdictional defect." *Id.* at 702 n.2, 907 S.E.2d at 80 n.2.

The Indictments in the instant case are distinguishable from those in *Coffey* and *Wilkins*. Here, the Indictments stated:

> THE JURORS FOR THE STATE, UPON THEIR OATH, present that on or about [Date], in Cherokee County, the defendant named above did unlawfully, willfully and feloniously did obstruct justice. The defendant, as the attorney for the Cherokee County Department of Social Services, created, improperly prepared, approved, made a custom practice, and used a "Custody and Visitation Agreement" (CVA) in the matter of [Minor Child],

which was an agreement that allowed the removal of minor children from their parent(s) without court involvement, in violation of North Carolina law. The use of this agreement effectively avoided judicial oversight into the activities of Cherokee County DSS, and subverted the statutory process for determining abuse and neglect of children, and determining custody and parental rights. The practice of using a CVA in this matter interfered with the parental relationship between a parent and child, violating the constitutional and statutory rights of parents and minor children. This offense was done in secrecy and with malice; with deceit and intent to defraud; was infamous; and was done in violation of the common law, and against the peace and dignity of the State.

We note the language alleging Defendant's use of CVAs "allowed the removal of minor children from their parent(s) without court involvement, in violation of North Carolina law" and "effectively avoided judicial oversight into the activities" of Cherokee DSS. Unlike in *Wilkins*, the references to avoiding judicial oversight suggests Defendant committed the alleged acts to "subvert" a potential judicial proceeding. *Id.* at 701, 907 S.E.2d at 79. Thus, we cannot say the Indictments "did not allege conduct that could be understood to constitute common law obstruction of justice[.]" *Id.* at 702 n.2, 907 S.E.2d at 80 n.2. Therefore, the language in the Indictments did not create a jurisdictional defect. *See id.*; *Singleton*, 386 N.C. at 184, 900 S.E.2d at 805.

Defendant also notes the Indictments "did not allege the purpose of the [CVAs]." Here, Defendant appears to argue the Indictments are flawed because they did not allege he used CVAs "for the purpose" of obstructing an ongoing or potential official or judicial investigation or proceeding—a required element of the offense

under *Coffey*. In substance, Defendant is claiming a non-jurisdictional defect, because he contends the Indictments did not state with "sufficient precision" the facts underlying an element of the offense. *Singleton*, 386 N.C. at 199, 900 S.E.2d at 814. However, even assuming the omission of the CVAs' "purpose" from the Indictments was error, Defendant does not explain, as is required, how such an error was prejudicial. *See id.* at 210, 900 S.E.2d at 821.

Thus, there is no jurisdictional defect in the Indictments under *Coffey* and *Wilkins* and, to the extent Defendant alleges a non-jurisdictional defect, he has not shown any such error was prejudicial. *See id.* Therefore, the Indictments were sufficient because they alleged facts supporting the essential elements of the charged offenses. *See Horton*, 294 N.C. App. at 617, 903 S.E.2d at 874. Consequently, the trial court did not err by denying Defendant's Motion to Dismiss the Indictments. *See id.* at 619, 903 S.E.2d at 875.

## Conclusion

Accordingly, for the foregoing reasons, we conclude there was no error at Defendant's trial and affirm the Judgment.

NO ERROR.

Judges GORE and GRIFFIN concur.